**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.:   16-0073 (RC) |
| | : | |
| TYRONE WRIGHT, | : | Re Document Nos.:   7, 28 |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

### DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

## I. INTRODUCTION

Defendant Tyrone Wright is charged with three counts of bank robbery in violation of 18, U.S.C. § 2113(a). The government alleges that, over a two-day period, Mr. Wright robbed a Premier Bank, twice, and a TD Bank, once. Mr. Wright, *pro se*, moved to suppress some of the physical evidence and statements that the government collected.[1] *See* Mot. Suppress Evid. & Statements, ECF No. 7 (Mot. Suppress). The government opposed this motion. *See* Gov't's Opp'n Def.'s Mot. Suppress Evid. & Statements (Opp'n Suppress), ECF No. 12. Later, while Mr. Wright was represented by counsel, his counsel filed a supplemental suppression motion.[2] Mot. Suppress Statements & Tangible Evidence & Supp. P. & A. (2d Mot. Suppress), ECF No. 28. Mr. Wright is currently *pro se* once more. The Court held an evidentiary hearing on the

---

[1] Mr. Wright also requested, in the same motion, that the Court issue various subpoenas. Mot. Suppress at 6. The Court has already denied this portion of Mr. Wright's motion in its prior memorandum opinion. Memorandum Opinion at 6–7, ECF No. 42.

[2] Mr. Wright has not otherwise replied to the government's opposition, and the time permitted for a reply by the Local Rules has now passed. *See* LCrR 47(d) (requiring that a reply memorandum be filed within seven days of the service of the memorandum in opposition).

suppression motion on January 31, 2017, and is now prepared to rule. For the following reasons, the Court denies Mr. Wright's motion to suppress evidence and statements.

## II.  BACKGROUND

The government's evidence presented at the suppression hearing provided the following account of the three bank robberies allegedly committed by Mr. Wright. On April 20, 2016, a Premier Bank in D.C. was robbed by a person who passed a note to the teller and received money. 1st Tr. 17:25–18:4, 20:3–14[3] (testimony of Special Agent Reginald Harris). Law enforcement officers interviewed bank employees and "the victim teller identified the bank robbery suspect because [the victim teller] had previous dealings with him" while the bank teller was employed at a different location. 1st Tr. 18:25–19:5 (testimony of Special Agent Harris). The bank teller identified the robber by name as Tyrone Wright. 1st Tr. 19:12–15 (testimony of Special Agent Harris). The bank teller also provided Mr. Wright's birth date and address.[4] 2d Tr. 3:13–15 (testimony of Sergeant Morani Hines). The bank's security system recorded video of the robbery, and a photograph from that footage was circulated to law enforcement officers later that day. 1st Tr. 20:18–21:25 (testimony of Special Agent Harris). The distributed photograph clearly shows the robber's face. Gov't Ex. H-7. Law enforcement officers also spoke to library police officer Vernon Smith at the Northwest One library after they learned that he might have knowledge related to the robbery. 1st Tr. 22–23 (testimony of Special Agent Harris). Officer

---

[3] Citations to the transcript refer to the rough draft of the transcript of the evidentiary hearing held January 31, 2017. The precise text of the transcript as well as page and line numbers may differ in the final version. The first transcript refers to the transcript of the morning session, and the second transcript refers to the transcript of the afternoon session.

[4] Later on April 20, law enforcement officers visited that address, but the location was abandoned. 2d Tr. 39:10–19 (testimony of Sergeant Hines).

Smith identified Tyrone Wright by name as the person in the photograph from the Premier Bank robbery.[5] 1st Tr. 24–25 (testimony of Special Agent Harris). Later on April 20, law enforcement officers received and reviewed additional photographs from the bank's surveillance system. 1st Tr. 26:9–27:4, Gov't Ex. H-8.

On the next day—April 21, 2016—a TD bank in D.C. was robbed using a note. 2d Tr. 4:4–14 (testimony of Sergeant Hines). The bank employee gave the robber money and a red dye pack, and the dye pack triggered as the robber exited the bank. 2d Tr. 4:13–17 (testimony of Sergeant Hines). Law enforcement officers recovered some money and the dye pack on the street near the bank. 2d Tr. 4:15–5:9 (testimony of Sergeant Hines); *see also* Gov't Ex. 27. The Premier Bank which had been robbed on April 20 was also robbed again on April 21. 2d Tr. 5:19–6:5 (testimony of Sergeant Hines). Photographs from the surveillance video at both banks were circulated to law enforcement. Gov't Ex. H-9 (still photographs from the TD bank robbery

---

[5] Mr. Wright's briefing theorizes that the library used his ID cards—which he sometimes left at the library front desk—to help law enforcement officers identify him. Mot. Suppress at 2. Mr. Wright identifies a purported privacy violation. However, Mr. Wright presents no evidence supporting this version of his identification, and the Court credits the government's thorough explanation of the two independent methods it used to identify him.

Mr. Wright also expresses suspicion because at least one law enforcement report refers to an "unidentified" bank robbery suspect. *See generally* 1st Tr. 45–46 (testimony of Special Agent Harris); 2d Tr. 38 (testimony of Sergeant Hines). However, the Court credits the government's evidence, as expressed in Special Agent Harris's testimony, that the report uses the term "unidentified" to describe the suspect prior to his identification by the library police officer. 1st Tr. 47:7–11; 51:12–52:8 (testimony of Special Agent Harris).

In any event, even if the Court accepted Mr. Wright's version of both of these events, Mr. Wright does not explain their relevance to any legal theory. *See Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[I]t is not the obligation of this Court to research and construct the legal arguments available to the parties. To the contrary, perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." (internal quotation marks and citations omitted)). To the extent that Mr. Wright wishes to argue about the weight of the government's evidence or identify apparent inconsistencies in it, he may of course do so at trial.

on April 21); Gov't Ex. H-10 (still photographs from the Premier Bank robbery on April 21); *see also* 2d Tr. 32:1–20 (testimony of Sergeant Hines).

After the two robberies occurred on April 21, Special Agent Harris was dispatched to the Northwest One library as part of the responding taskforce. 1st Tr. 28:19–22. As Special Agent Harris approached, he saw Mr. Wright walking near the Northwest One library and recognized him from the surveillance photographs circulated after the April 20 robbery.[6] 1st Tr. 29:11–30:1 (testimony of Special Agent Harris). Special Agent Harris and his partner followed Mr. Wright and saw him enter the library. 1st Tr. 32:17–33:8 (testimony of Special Agent Harris). They entered the entrance hall of the library as Mr. Wright was coming back out of the library. 1st Tr. 33:24–34:14 (testimony of Special Agent Harris). Special Agent Harris asked if his name was Mr. Wright, and Mr. Wright confirmed that was his name. *See* 1st Tr. 35:18–21 (testimony of Special Agent Harris) (indicating that Special Agent Harris asked "was his name Mr. Tyrone Wright. I can't remember how I asked him. I think he asked me 'how do you know my name.'").[7] After confirming that the person was Mr. Wright, Special Agent Harris told Mr. Wright that he was a "person of interest" in an investigation and asked him to step outside. 1st Tr. 36 (testimony of Special Agent Harris). Mr. Wright cooperated with the officers and was not handcuffed or physically restrained. 1st Tr. 37 (testimony of Special Agent Harris).

---

[6] Mr. Wright's briefing claims that the clothing he was wearing did not match the witness's description of clothing worn by the robber, and that the officers accosted several other people near the library at random, including "juveniles." Mot. Suppress at 1–2. However, Mr. Wright offers no evidence to support either of these assertions, and the Court credits the testimony of Special Agent Harris to the contrary.

[7] Although Mr. Wright appears to disagree with Special Agent Harris's statement about the identification, 1st Tr. 49:13, Mr. Wright offers no evidence to the contrary, and does not describe the importance of the disagreement.

The officers talked with Mr. Wright for ten or fifteen minutes until additional officers arrived. 1st Tr. 39:17–40:12 (testimony of Special Agent Harris). This conversation apparently involved background information about Mr. Wright. 1st Tr. 40:12–17 (testimony of Special Agent Harris). Although Mr. Wright answered some questions, he also refused to answer other questions—for example, he refused to provide his address. 1st Tr. 41:25–42:2 (testimony of Special Agent Harris). During this time one of the officers noticed red marks on Mr. Wright's clothing and fingers. 1st Tr. 41:14–25 (testimony of Special Agent Harris); *see also* Gov't Ex. 38 (photograph of Mr. Wright at the library showing red marks on his shirt); Gov't Ex. 39 (photograph of Mr. Wright at the library showing red marks on his fingers).

After additional law enforcement officers arrived, including Sergeant Hines, the officers asked Mr. Wright if he would accompany them to police headquarters. 2d Tr. 6:21–8:13 (testimony of Sergeant Hines). Mr. Wright refused to go to police headquarters. 2d Tr. 8:13 (testimony of Sergeant Hines). After his refusal, the officers handcuffed Mr. Wright and patted him down. 2d Tr. 8:15–9:6 (testimony of Sergeant Hines). This pat-down produced several items of evidence and Mr. Wright was kept at the library until evidence technicians arrived to collect the items. 2d Tr. 9:14–10:16 (testimony of Sergeant Hines). The items collected at the library included keys, cigarettes, a cell phone, red-stained tissues, and a note reading "stay calm just pass over the money and no one gets hurt." 2d Tr. 24–27 (testimony of Sergeant Hines); *see also* Gov't Exs. 40, 41, 42, 43. During this time, one of the officers asked Mr. Wright about the red markings on his clothing, and Mr. Wright indicated that he had been painting. 2d Tr. 43:5–11 (testimony of Sergeant Hines).

After the evidence was collected, Mr. Wright was transported to the police station. 2d Tr. 9:14–10:16 (testimony of Sergeant Hines). Mr. Wright had still not been informed that he was

under arrest when he was transported in handcuffs to the station, although Sergeant Hines indicated that he could imagine no circumstances after arriving at the library in which he would not take Mr. Wright to police headquarters. 2d Tr. 10:17–20, 40:17–20 (testimony of Sergeant Hines).

At the station, additional evidence was collected from Mr. Wright. 2d Tr. 12:10–12 (testimony of Sergeant Hines); Gov't Ex. H-13. The evidence collected included Mr. Wright's clothes and both of his shoes, which were stuffed with money. 2d Tr. 12:10–12, 31:18–19 (testimony of Sergeant Hines); Gov't Ex. H-13. Mr. Wright was provided with a jumpsuit to wear and was restrained with ankle restraints inside the interview room. 2d Tr. 46:17–24 (testimony of Sergeant Hines); Gov't Ex. H-13. Sergeant Hines testified that he brought Mr. Wright water to drink at the police station.[8] 2d Tr. 11:19–20 (testimony of Sergeant Hines).

Mr. Wright's time at the police station was captured on video, beginning with the collection of evidence and clothing and continuing through his interview with police officers. *See* Gov't Ex. H-13. The Court has reviewed the entire three hour video recording. Before the interview began, Sergeant Hines read a sheet containing *Miranda* warnings to Mr. Wright,[9] and Mr. Wright acknowledged and signed the waiver.[10] 2d Tr. 12:19–23 (testimony of Sergeant

---

[8] Mr. Wright's motion claims that he was not provided any water to drink, Mot. Suppress at 5, but Mr. Wright provides no evidence supporting this assertion. Furthermore, the Court notes that the video shows Mr. Wright was provided with water. *See* Gov't Ex. H-13.

[9] Although Mr. Wright's briefing argues that he "only recalls [the *Miranda* rights being provided to him] in writing," Mot. Suppress at 4–5, not orally, he presents no evidence to support this assertion. Furthermore, the video viewed by the Court clearly shows that Sergeant Hines read Mr. Wright his *Miranda* rights aloud. *See* Gov't Ex. H-13.

[10] Mr. Wright argues that he did not actually check two of the checkboxes on the form. 2d Trans 14:7–16. Sergeant Hines indicated that he checked the boxes in accordance with Mr. Wright's oral statements at the time. 2d Tr. 16–17 (testimony of Sergeant Hines). In addition, the video shows Mr. Wright signing the acknowledgement form of his *Miranda* rights. *See* Gov't Ex. H-13.

Hines); *see also* Gov't Ex. H-13; Gov't Ex. H-6 (*Miranda* waiver form showing Mr. Wright's

signature). Sergeant Hines also testifies that Mr. Wright did not appear substantially impaired or

unable to understand any portion of the interview. 2d Tr. 35:6–14 (testimony of Sergeant Hines).

During the interview, Mr. Wright refused to answer several questions, including his home

address and the names of some of his associates. *See* 2d Tr. 35:18–21; Gov't Ex. H-13. Nor was

Mr. Wright physically threatened at any time. *See* 2d Tr. 35:22–36:1; Gov't Ex. H-13.

An initial indictment was filed on April 26, 2016, charging Mr. Wright with one count of

bank robbery in violation of 18 U.S.C. § 2231(a). 1st Indictment, ECF No. 3. Several months

later, on July 21, 2016, a superseding indictment was filed charging Mr. Wright with three

counts of bank robbery. 2d Indictment, ECF No. 9.

## III.  ANALYSIS

Mr. Wright asks the Court to "grant suppression of evidence and statements made by the

defendant." Mot. Suppress at 6; *see also* 2d Mot. Suppress at 1 (requesting that the Court

"suppress . . . all statements allegedly made by Mr. Wright to any government agent; tangible

evidence seized from Mr. Wright; and any other unlawfully seized evidence, and fruits thereof").

The Court interprets this request as both a motion to suppress some or all of the physical

evidence collected by law enforcement and a motion to suppress the statements made Mr.

Wright, and addresses each in turn. The Court considers the motion in light of the principle that

the government bears the burden of justifying a warrantless arrest or search. *United States v.

Jones*, 374 F. Supp. 2d 143, 147 (D.D.C. 2005); *see also United States v. Jeffers*, 342 U.S. 48, 51

(1951) ("[T]he burden is on those seeking the exemption to show the need for it[.]" (citation

omitted)); *United States v. Mangum*, 100 F.3d 164, 169 (D.C. Cir. 1996) ("The government

carries the burden of showing that the measures employed during the stop were justified."). In

this case, the government does not dispute that Mr. Wright was arrested without a warrant. *See,*

*e.g.*, 1st Tr. 43–44 (testimony of Special Agent Harris).

## A.  Physical Evidence

Mr. Wright requests the "suppression of evidence," Mot. Suppress at 6, apparently

referring to some or all of the physical evidence taken from his person on the day he was

arrested.[11] *See also* Mot. Suppress at 4 (complaining of the "seizure of items from defendant . . .

by actions of officers in violation of the [F]ourth [A]mendment"). The Court agrees with the

government that all of these items were seized in accordance with the Fourth Amendment as part

of a search incident to arrest.

The Fourth Amendment guarantees that the "right of the people to be secure in their

persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants

shall issue, but upon probable cause." U.S. Const. amend. IV. As a result of this guarantee, all

seizures must be "founded upon reasonable, objective justification." *United States v. Gross*, 784

F.3d 784, 786 (D.C. Cir. 2015) (internal quotation marks and citations omitted). Furthermore,

---

[11] It is unclear if Mr. Wright also objects to the introduction of any evidence collected from the restroom inside the public library. *See* Gov't Exs. 44, 45, 46 (photographs of public restroom and small puddle of reddened water). To the extent that Mr. Wright seeks the suppression of evidence from the library restroom, it is clear that his Fourth Amendment claim fails. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he [or she] personally has an expectation of privacy in the place searched, and that his [or her] expectation is reasonable; i.e., one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Minnesota v. Carter*, 525 U.S. 83, 88, (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143–144 & n.12 (1978)). Here, the Court has little difficulty concluding that a person does not have a reasonable expectation of privacy in the water left on the floor of a public restroom after that person has finished using the restroom and exited the premises. It is the common understanding of society that such a restroom is then open to being entered by any other person, and any items or water left within the restroom are likewise open to inspection.

"when the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

A search incident to a lawful arrest is "not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *United States v. Robinson*, 414 U.S. 218, 235 (1973); *see also Dickey v. United States*, 174 F. Supp. 3d 366, 369–70 (D.D.C. 2016) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973))). The Court thus turns to the question of whether Mr. Wright's arrest here was lawful, and whether the search of Mr. Wright was properly incident to the arrest.

First, the Court considers the lawfulness of the arrest. Although a warrant provides the grounds for the prototypical lawful arrest, there are exceptions to the warrant requirement. The arrest "of an individual in a public place for a felony" is at the heart of permissible warrantless arrests. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). To make such a warrantless arrest, a law enforcement officer must have "probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *United States v. Watson*, 423 U.S. 411, 417–424 (1976)). Here, depending on the timing, Mr. Wright was apparently arrested either in the library entryway or on the street in front of the library, both of which are public places. Nor does Mr. Wright dispute that the offense at issue—bank robbery— is a felony. Thus if the law enforcement officers had probable cause to arrest Mr. Wright, the arrest was lawful.

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152 (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "The quantum of information which constitutes probable cause—evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed—must be measured by the facts of the particular case." *Wong Sun*, 371 U.S. at 479 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

Here, the law enforcement officers clearly had the necessary quantum of evidence to find probable cause as to Mr. Wright. At the first moment that law enforcement officers encountered Mr. Wright at the library on April 21, those officers had already seen photographic images of the person who robbed the Premier Bank on April 20, and could mentally compare those images with Mr. Wright in order to identify him. Furthermore, the officers knew that Mr. Wright frequented the Northwest One library. Indeed, Special Agent Harris testified that he recognized Mr. Wright from the Premier Bank photos when he first saw Mr. Wright on the street outside the library. 1st Tr. 29:11–30:1 (testimony of Special Agent Harris).

Depending on when the arrest actually occurred, the officers might have had even more evidence to support probable cause. For example, the officers immediately confirmed Mr. Wright's identity by asking him his name, which was consistent with the name the bank teller provided for the robber. 1st Tr. 35:18–21 (testimony of Special Agent Harris). As the interaction between the officers and Mr. Wright continued, the officers saw the red markings on his skin and clothing that were consistent with the dye pack from the TD Bank robbery. However, in this case the Court need not determine the precise moment when Mr. Wright was arrested[12] because

---

[12] The government avoids taking a position as to when Mr. Wright was actually arrested. In its briefing, the government asserts that Mr. Wright was seized when handcuffed, but that "was not the functional equivalent of an arrest at that point and one which was permissible under

probable cause was present from the beginning of the officers' interactions with Mr. Wright. His arrest was therefore not in violation of the Fourth Amendment.

Second, the Court considers whether the search of Mr. Wright was properly incident to his arrest. All of the physical evidence collected appears to have been taken from Mr. Wright's person, including his clothing, shoes, and the contents of his pockets. Each of these locations is clearly within the scope of a search incident to arrest. Such a search can properly include "the arrestee's person and the area within his [or her] immediate control." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969), *abrogated* by *Davis v. United States*, 564 U.S. 229 (2011)). For these reasons, the Court concludes that the physical evidence was properly obtained as part of a search incident to a lawful arrest.[13]

---

*Terry* and progeny." Opp'n Suppress ¶ 26. Mr. Wright also appears to argue that he was not arrested until, at least, after he was handcuffed. 1st Tr. 15:13–16. At the evidentiary hearing the government argued, in contrast, that "the Court can conclude [that Mr. Wright was arrested] by the time that he was handcuffed or certainly shortly thereafter." 2d Tr. 60:9–14.

Because the Court agrees with the government that a search incident to arrest need not follow the arrest, it need not resolve this timing issue. *See, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."); *United States v. Cutchin*, 956 F.2d 1216, 1219 (D.C. Cir. 1992) ("[The police officer] testified that at the time of the frisk he intended to arrest [the defendant] for driving without a license. . . . It is of no moment that [the officer] conducted the frisk before he formally placed [the defendant] under arrest.").

[13] It is unclear if Mr. Wright also challenges the seizure of his person. *See* Mot. Suppress at 3 (arguing that he was "detained for one hour and three minutes" and that such a detention exceeds the permissible bounds of a *Terry* stop); 2d Mot. Suppress at 4–7, ECF No. 28. Mr. Wright did not develop any evidence relating to the length or conditions of his detention at the evidentiary hearing. Furthermore, the only relief Mr. Wright has requested is the suppression of the physical evidence and statements obtained during his detention as the fruits of the unlawful detention.

Given that the detention undoubtedly converted into an arrest at some point, and that the officers had probable cause to make an arrest from the beginning of the interaction, the physical evidence obtained would be proper in any event as the results of a search incident to arrest, as discussed previously. The government does not intend to use Mr. Wright's statements in its case-in-chief, and they are thus subject only to a voluntariness analysis as performed below.

## B.  Statements

In addition to the physical evidence, Mr. Wright also requests "suppression of . . . statements made by the defendant . . . while [there was] no application of *Miranda* protection," and that the Court exclude later statements "due to conditions imposed by officers of duress and intimidation." Mot. Suppress at 6.

In general, the government states that it does not intend to use Mr. Wright's statements in its case-in-chief.[14] *See* Opp'n Suppress ¶ 30 (stating that the government "does not intend to use

---

[14] The government indicated that it may seek to use Mr. Wright's statement of his name, upon first speaking with the officers at the library, in its case-in-chief. Although the government concedes that no *Miranda* warnings were given to Mr. Wright prior to the statement, asking a person's name is not the type of statement to which *Miranda* applies. *Miranda* applies only to questioning by law enforcement officials that is both "in-custody," *United States v. Williamson*, 181 F. Supp. 3d 41 (D.D.C. 2014) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 587 (1990)), and rises to the level of an "interrogation," *id.* (citing *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980)). Even assuming, *arguendo*, that Mr. Wright was in custody at the time that he provided his name, the conversation did not constitute an interrogation.

"Interrogation" under *Miranda* includes both express questioning and "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation," unless the incriminating response is "unforeseeable." *Id.* at 301–02. The Supreme Court has repeatedly held that *Miranda* does not apply to routine booking questions. *See Muniz*, 496 U.S. at 601 ("[R]esponses to questions that otherwise qualify as 'custodial interrogation' are rendered admissible when they fall within the 'routine booking question' exception."); *United States v. Edwards*, 885 F.2d 377, 385–86 (7th Cir. 1989) (holding that "questions such as 'what is your name?' and 'where do you live?' will not usually constitute interrogation within the meaning of *Miranda*" and that such questions may be asked at the time of the arrest rather than during the booking process); *see also United States v. Williamson*, 181 F. Supp. 3d 41 (D.D.C. 2014) (holding that asking a suspect why he was so mad fell outside of the routine booking question exception and thus required *Miranda* warnings).

In the conversation that identified Mr. Wright, the officers asked Mr. Wright a question similar to "what is your name?" or "are you Tyrone Wright?" Questions of this nature are akin to routine booking questions, and the officers thus were not required to provide *Miranda* warnings to Mr. Wright.

Because the government has indicated that it does not intend to introduce any other statements made by Mr. Wright at the library in its case-in-chief, the Court does not analyze whether *Miranda* warnings would have been required for such statements. The Court questions, however, whether it could conclude that these other statements did not require *Miranda*

the [videotaped] statement in its case-in-chief at trial"); 1st Tr. 10:23–11:15 (stating that the

government did not intend to use Mr. Wright's statements prior to the interview at the police

station in its case-in-chief). However, the government does wish to maintain the possibility of

using the statements to impeach Mr. Wright, should he testify. Opp'n Suppress ¶ 30; 1st Tr.

11:6–15. Because the government does not intend to use Mr. Wright's statements directly, the

Court thus need not perform a searching *Miranda* analysis. The standard for use of statements for

impeachment is lower than in the case-in-chief, but the government still "bears the burden of

proving that the statements were voluntary." *United States v. Murdock*, 667 F.3d 1302, 1305–06

(D.C. Cir. 2012) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). The Court thus turns to Mr.

---

warnings. *Miranda* warnings are required before (1) in-custody (2) interrogations. *See, e.g.*, *United States v. Williamson*, 181 F. Supp. 3d 41 (D.D.C. 2014). In this analysis the government bears the burden of showing that the statements that it seeks to use are admissible. *See, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 608 & n.1 (2004).

For example, the officers elicited a statement from Mr. Wright at the library about the origin of the red markings on his skin and clothing. Unlike the conversation about Mr. Wright's name, asking Mr. Wright to explain the red markings on his clothing and skin certainly appears likely to lead to an incriminating response, and thus could constitute an interrogation. If the questioning was interrogatory, the Court would then have to determine if Mr. Wright was in custody at the time and therefore entitled to *Miranda* protections.

To determine if a person is in custody, the Supreme Court has instructed courts to apply "an objective standard that focuses on whether 'a reasonable person' in the suspect's position would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Richardson*, 36 F. Supp. 3d 120, 126–27 (D.D.C. 2014) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam) and others). This fact-specific analysis depends on "the location and length of the encounter, the number of officers and citizens present, whether the police entered the location by force, whether the officers' weapons were visible or drawn, whether officers were present throughout the encounter, whether the suspect was handcuffed, and the tone and demeanor of the officers and the suspect." *United States v. Richardson*, 36 F. Supp. 3d 120, 127 (D.D.C. 2014). Returning to the example of the markings on Mr. Wright's skin and clothing, Sergeant Hines testified that he heard the relevant conversation after he arrived on the scene. 2d Tr. 43:5–11 (testimony of Sergeant Hines). It is not clear from the record if Mr. Wright had been handcuffed yet. The Court would need to evaluate the totality of the circumstances and determine whether Mr. Wright was in custody at that moment. As discussed above, the Court does not reach this issue because the government has indicated it does not intend to introduce these statements in its case-in-chief.

Wright's arguments that his statements were involuntary. *See* Mot. Suppress at 5–6; 2d Mot.

Suppress at 7–8.

"Voluntariness turns on whether the 'defendant's will was overborne' when he gave his

statement." *Murdock*, 667 F.3d at 1305 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226

(1973)). Determining voluntariness is a legal question that "requires [a] careful evaluation of all

the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978). This

totality-of-the-circumstances approach involves an inquiry into the defendant's age, experience,

education, background, intelligence, and the circumstances surrounding the interrogation, among

other factors. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Brewer v. Williams*, 430 U.S. 387,

404 (1977); *Faretta v. California*, 422 U.S. 806, 835 (1975); *Johnson v. Zerbst*, 304 U.S. 458,

464 (1938). In this case, nothing in Mr. Wright's age, experience, education, background, or

intelligence suggests that his will would have been overborne by the circumstances; indeed, Mr.

Wright has been representing himself and filing motions on his own behalf in this proceeding.

The Court first considers the circumstances of Mr. Wright's statements outside the

library. Mr. Wright presents no argument as to why they were involuntary. There is no evidence

that Mr. Wright was threatened, coerced, or mistreated in any way. Indeed, the officers described

their interactions with Mr. Wright as focused on building "rapport." 2d Tr. 8:2–5 (testimony of

Sergeant Hines). Mr. Wright answered some questions, but refused to answer others—such as

what his address was, 1st Tr. 41:25–42:2 (testimony of Special Agent Harris)—indicating that

his will had not been overborne. The Court thus concludes that Mr. Wright's statements at the

library were voluntary and may be used for impeachment if Mr. Wright testifies at trial.

Next, the Court considers the circumstances of Mr. Wright's statements at the police

station. Mr. Wright focuses his arguments here, noting that he was restrained in ankle restraints

and alluding to the "control, intimidation and coercion" of the officers. Mot. Suppress at 5. While Mr. Wright was restrained, that is not sufficient to make his statements involuntary. *See United States v. Stroud*, 62 F. App'x 886, 890 (10th Cir. 2003) (holding that a confession obtained while the defendant was shackled was not involuntary); *see also United States v. Doe*, 149 F.3d 634, 639 (7th Cir. 1998) (finding that a waiver was not involuntary when it occurred while defendant was handcuffed in the back of a squad car with officers wearing masks). Mr. Wright also argues that he was "deprived of water" after being "in hot sun" for several hours. Mot. Suppress at 5. However, based on Sergeant Hines's testimony and the video of Mr. Wright's interview, the Court finds that he did, in fact, receive water. 2d Tr. 11:19–20 (testimony of Sergeant Hines); Gov't Ex. H-13. The video of Mr. Wright's interview, which the Court has reviewed, clearly shows that he was not mistreated, physically abused, or threatened during the interview. *See* Gov't Ex. H-13.

In addition, Mr. Wright waived his *Miranda* rights before providing his statement, which is further evidence of voluntariness. *See United States v. Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016) (citing *Dickerson v. United States*, 530 U.S. 428, 444 (2000)). Although Mr. Wright disputes that he actually checked the boxes himself, Sergeant Hines's testimony and the video show that Mr. Wright was informed of his *Miranda* rights and signed the waiver.[15] 2d Tr. 12:19– 23 (testimony of Sergeant Hines); *see also* Gov't Ex. H-13; Gov't Ex. H-6 (*Miranda* waiver form showing Mr. Wright's signature). Finally, Mr. Wright refused to answer several questions during the interview, including his address and the names of his associates. Gov't Ex. H-13. Mr.

---

[15] Even if Mr. Wright had not signed the waiver, that would not conclusively establish that he had not waived his *Miranda* rights. A defendant who does not sign may still waive his or her *Miranda* rights orally or by answering questions after being informed of the rights. *See United States v. Adams*, 583 F.3d 457, 468 (6th Cir. 2009) (finding that a defendant had waived his rights orally although the box on the written form was empty).

Wright's ability to pick and choose which questions he answered is further evidence that his will was not overborne and his statements were voluntary. For these reasons, the Court finds that Mr. Wright's statements at the police station were voluntary and may be used for impeachment should Mr. Wright decide to testify at trial.

## IV.  CONCLUSION

For the foregoing reasons, Mr. Wright's motion to suppress evidence and statements is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 2, 2017                                            RUDOLPH CONTRERAS
                                                                             United States District Judge